Nicholas M. Pette, J.
Plaintiff sues to set aside and cancel
of record two deeds in which, title to two parcels of real estate in Bayside, Queens County, New York, purported to be conveyed by her — one parcel to a son, and the other to a daughter, who are the defendants herein. She also asks that the defendants account to her for the rents, issues and profits or the fair rental value of said real property.
Plaintiff alleges that she did not intend to convey said realty to the defendants and that she did not know she was executing two deeds conveying said property when she affixed her cross to said instruments, and that she was induced to do so by reason of the misrepresentations, fraud and.deceit practiced upon her by the defendants, and that she received no consideration whatsoever.
The complaint also alleges, inter alia, that the defendants, intending to defraud the plaintiff of her real property, fraudulently and deceitfully represented and induced her to believe that in the event of her death, plaintiff’s oldest daughter would inherit her entire estate, both real and personal, to the exclusion of the defendants, unless plaintiff made a will making a more equitable distribution of her property; that they fraudulently represented to plaintiff that they would procure a lawyer to prepare a last will and testament for her, which will would provide equitably for her children, including the defendants, and that they would arrange for an opportunity for plaintiff to execute said will; that the defendants consulted an attorney, but made no arrangements with the attorney for the preparation of such a will, and fraudulently, and with intent to defraud plaintiff of her said real property, requested the attorney to prepare the two separate deeds that are the subject of this action; that in reliance upon said representations and believing them to be true, at the instance of the defendants, plaintiff, on or about June 11,1956, did, by and with her cross mark, execute said instruments, believing them to be her last will and testament as represented to her by the defendants, but which in effect were not her last will and testament, but the aforesaid deeds of conveyance.
The testimony discloses that Howard Locker, the husband of the defendant Gladys Locker, contacted and arranged for a lawyer to go to the house where he, plaintiff and the defendant Gladys Locker resided; that Gladys Locker had a bank safe-deposit box to which she possessed the key, in which she had *254 control and possession of the deeds to said real property through which the plaintiff acquired title. The testimony further discloses that said lawyer, who it appears was a stranger to the plaintiff, came to said house to interview the plaintiff. The lawyer testified that he recognized the fact that there was a language barrier between him and the plaintiff, as a result of his attempts to talk to plaintiff in English and that in his attempts to talk with the plaintiff, the defendant, Gladys Locker, interpreted to some extent; that in those instances the daughter spoke to the mother in a language he believed was Polish. What the daughter said to the plaintiff in acting as an interpreter during the lawyer’s “general conversation” with plaintiff, the lawyer testified he did not know. He further testified that he could not recall anything that the plaintiff had said during his conversations with her besides “yes” and “no ”, What tests the lawyer employed, if any, to satisfy himself that the plaintiff understood what he said to her when she answered “yes ” or “no ”, were not disclosed on his examination. He testified that it was his impression that plaintiff understood what he said to her during his conversations with her, both at the house as well as at his office. It appears that, except for a very brief period in the lawyer’s office, the beneficiary-daughter, defendant Gladys Locker and her husband, were at all times present when the lawyer was with the aged plaintiff. Therefore, opportunity to exercise undue influence and misrepresentation on the plaintiff by the Lockers, appears to have been existent. Questioned as to whether plaintiff had told him that she wanted to convey the corner plot, the lawyer testified: “ Well, under the same sort of circumstances. In other words, she didn’t say that in so many words but the Lockers talked to her and then told me what she wanted. I explained to her what I understood she wanted and then she answered ”, yes or no.
The court is convinced and finds, that plaintiff, who testified through an official court interpreter, did not have such command of the English language, to understand what was said to her in English or to comprehend the nature and contents of the deeds to which she could only, and did, affix her cross mark. The court is satisfied that the attorney who testified was honest, but is of the opinion that said attorney’s impression that plaintiff understood what he said to her and that she understood the nature and contents of the instruments she executed, does not measure up to that quality and degree of reasonable certainty necessary to satisfactorily establish that this old lady actually understood said attorney or that she *255 understood the nature of said instruments at the time she executed the same by cross mark.
The court permitted said attorney to testify to communications made to him by the plaintiff and said attorney’s advice to the plaintiff in relation to the preparation and contents of the instruments said attorney was to prepare and had prepared, with the reservation however, that the same were allowed subject to a motion to strike them out if the court subsequently decided that the same were privileged communications between attorney and client in the course of his professional employment. The communications by plaintiff to said attorney, as well as said attorney’s communications to the plaintiff, were made through the Lockers, who acted as interpreters and intermediaries.
The court is of the opinion that the aforesaid disclosures ' were privileged communications between attorney and client, and inadmissible. Accordingly, the court now strikes them out, and they cannot be considered in the determination of the issues presented in this case. However, this determination, is in no way intended as any reflection upon the attorney who testified, whose high standing at the bar and fine reputation, the court is cognizant of.
The long-established attorney-client privilege written into our law is confined to the nondisclosure of communications made by the client to the attorney or the attorney’s advice thereon, in the course of the attorney’s professional employment (Civ. Prac. Act, § 353).
Both at common law and under express statutes it is well settled that confidential communications, communicated in the course of professional employment between an attorney and his client, may not, without the consent of the client, be divulged by the attorney. (Rieser Co. v. Loew’s Inc., 194 Misc. 119.) The principle that certain relations are confidential and certain comm unications privileged against disclosure is a rule of evidence, based upon public policy (97 C. J. S., Witnesses, § 25-2, p. 738; Scolavino v. State of New York, 271 App. Div. 618, affd. 297 N. Y. 460). The rule applies when the client is a witness as well as when the attorney is asked to testify (Rieser Co. v. Loew’s, Inc., supra, Bolt & Co. v. Gilmore, 120 Misc. 116). A communication which is privileged when made remains privileged forever, unless the privilege is waived by the client (Yordan v. Hess, 13 Johns. 492; Fox v. Forty-Four Cigar Co., 90 N. J. L. 483).
As a general rule, a communication by a client to his attorney by any form of agency employed or set in motion by the client *256 is within the privilege. Accordingly, Communications to any person whose intervention is necessary to secure and facilitate the communication between attorney and client are privileged, as communications through an interpreter, a messenger, or any other intermediary.
The privilege is personal to the one making the disclosure by reason of the confidential relationship, and may be waived by the person in whose favor it exists, and by no one else (Vilardi v. Vilardi, 200 Misc. 1043). At the trial any party to the action may object to evidence which comes within the prohibition of the statute, and it remains for the client to waive the privilege (Matter of Warrington [State of New York), 303 N. Y. 129; Westover v. Ætna Life Ins. Co., 99 N. Y. 56, 59-60). Failure on the part of the attorney to object is not a waiver where, under the statute, the person failing to object had no right to waive (Wallace v. Wallace, 158 App. Div. 273, affd. 216 N. Y. 28; Westphal v. State of New York, 191 Misc. 688). The statute provides that the waiver, however, must be made upon the trial or examination or by stipulation of the attorneys before trial (Civ. Prac. Act, § 354). Testimony of the client which is brought out on cross-examination does not amount to a waiver on his part, so as to render the attorney competent to testify concerning the privileged communication (Kaufman v. Rosenshine, 97 App. Div. 514, affd. 183 N. Y. 562).
The contention of defendants’ attorney that since the plaintiff was not in the courtroom when her counsel objected to the disclosure of the privileged communications, the objection could not be sustained by the court, begs the question. The court is of the opinion that it was entirely proper and necessary for plaintiff’s attorney to claim the privilege in the plaintiff’s behalf and protect her from such disclosure of the privileged communications (Matter of Warrington [State of New York], supra). And as we have noted above, the privilege can only be waived by the plaintiff, and the fact that the lawyer who testified to said confidential communications did not urge the privilege before testifying, did not constitute any waiver, since he could not waive the privilege.
It is deplorable that this unfortunate litigation between this old and infirm mother and two of her children has been presented to the court. The precepts of the Decalogue apparently had little, if any, influence, towards effecting any reconciliation of the dispute, and do seem to have lost their significance here. Of course, while this court does not in this action, pass upon or attempt to adjudicate the filial obligations of children to their parents, it nevertheless, has in mind the spiritual and moral *257 precepts of the Decalogue, and is prone to regretfully observe that the tenents of this Divine ordinance have apparently been unheeded. The court finds that it is significant that this aged mother found it necessary to institute this action against two of her five children.
From all the evidence adduced before me, I find that no adequate reasons appear from which the court may properly infer that the defendants were considered by their aged mother as the preferred objects of her bounty to the exclusion of all her other children. There can be no gainsaying, that there is nothing transcending a mother’s love for her offspring and that the normal instincts of motherhood is to be fair and just to each of her children, whether it be in the giving of her love or the distribution of her bounty. To quote Cicero: “ The office of liberality consists in giving with judgment ”. There is nothing in this case from which the court can find that the defendants did any more for their aged mother than her other children, to warrant any preference, or that the mother had any other motive or incentive to impel her to convey the only realty she possessed to the defendants and ignore her other children. She testified that she did not want her oldest daughter to get her property, thereby manifesting her judgment of the inequality such disposition of her property would cause between all her children and motivating her to execute what she understood and believed to be her will providing for a more equitable distribution of her property among all her children, but which in effect were the two deeds that are the subjects of this action.
Virtues and vices are all put in motion by interest. When interest is at variance with conscience, any pretense that seems to reconcile them, cannot satisfy the principles of equity. It is regrettable, if desire for the earthly possessions that are involved in this action have transcended spiritual and moral values, and that they should be cause for this litigation, and the inevitable cleavage apparently caused between this old mother and her children. It would seem, that in her declining years and her poor condition of health, she should be blessed with that measure of harmony and peace, the love and respect of all her children should certainly bring to her, instead of her having to resort to the court for redress and the adjudication of her rights in this matter. Plaintiff, could she read and understand English, might feel as Shakespeare did when he wrote: “ How sharper than a serpent’s tooth it is to have a thankless child. Filial ingratitude! Is it not as this mouth should tear this hand for lifting food to it ”.
*258 As I have stated, the evidence adduced before me does not disclose that the defendants performed any untoward act for their aged mother that would warrant her giving* her bounty to them to the exclusion of all her other children. True, the law dictates that love and affection of this mother for the defendants could be adequate and sufficient consideration. However, the evidence fails to disclose that such love and affection was the consideration for said deeds, but on the other hand the mother’s testimony directly contradicts any such inference and she testified that she was misled into believing said deeds to be other than conveyances of her real property to the defendants.
The court had ample opportunity to observe the witnesses and to note their demeanor and the quality and character of their testimony. The court was impressed by the demeanor of this old lady as she testified through the official court interpreter, and with the character and quality of her testimony. In the court’s opinion, she was frank and truthful and her testimony worthy of belief. It is incredible to even assume, that this aged and infirm mother, whose time to depart from this earth and to face her Maker is indeed limited, would deliberately falsify and accuse her children of misleading her to obtain her real property. In contrast, the testimony of the defendants, in the court’s opinion, did not come up to those standards by which the court can say that their testimony was credible.
Taking* into consideration all the evidence in this case, the court is satisfied that the plaintiff has sustained the burden of proof by a preponderance of all the credible evidence, and I find that the plaintiff did not know that 'she was executing two deeds to her real property; that she did not intend to convey title thereto to the defendants, and that the execution of said deeds was procured through the misrepresentations and fraud practiced upon her by her daughter, the defendant Gladys Locker and the latter’s husband; and that plaintiff is entitled to the relief prayed for in her complaint.
The foregoing constitute my findings of fact and conclusions of law.
Accordingly, I direct judgment for the plaintiff, setting* aside and canceling the said two deeds of record and directing that the defendants account to the plaintiff for the rents, issues and profits of said real property or for the reasonable rental value thereof, together with costs.
The foregoing constitutes the decision of the court pursuant to the provisions of section 440 of the Civil Practice Act.